# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2023

Lyle W. Cayce
Clerk

No. 21-20658

UNITED STATES OF AMERICA,

*Plaintiff—Appellant*,

*versus*

DAISY TERESA RAFOI BLEULER,

*Defendant—Appellee*.

CONSOLIDATED WITH

No. 22-20377

UNITED STATES OF AMERICA,

*Plaintiff—Appellant*,

*versus*

PAULO JORGE DA COSTA CASQUIERO MURTA,

*Defendant—Appellee*.

No. 21-20658
c/w No.22-20377

---

Appeals from the United States District Court
for the Southern District of Texas
USDC Nos. 4:17-CR-514-7, 4:17-CR-514-8

---

Before Graves, Willett, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

This appeal concerns an alleged international bribery scheme between U.S.-based businesses and Venezuelan officials. On defendants-appellees' motions, the district court dismissed all counts charged against them and suppressed statements made during an interview. The government timely appealed. We REVERSE and REMAND.

## I. Background:

According to the indictment, Daisy Teresa Rafoi Bleuler ("Rafoi"), a citizen of Switzerland and a partner in a Swiss wealth-management firm, and Paulo Jorge Da Costa Casqueiro Murta ("Murta"), a citizen of Portugal and Switzerland and an employee of a different Swiss wealth-management firm, (together, "Defendants"), engaged in an international bribery scheme wherein U.S.-based businesses paid bribes to Venezuelan officials for priority payment of invoices and other favorable treatment from Venezuela's state-owned energy company. The indictment alleges that between 2011 and 2013, Defendants, working as agents for their co-conspirators, laundered the proceeds of the bribery scheme through numerous financial transactions, including through international wire transfers to and from bank accounts that they opened overseas in the names of various companies. Specifically, the indictment provides that in the Southern District of Texas and elsewhere, Defendants communicated with their co-conspirators through e-mail, phone, and various messaging applications to set up bank accounts into which their co-conspirators' bribe payments could be deposited and created false justifications for those payments to conceal and disguise their nature, source,

No. 21-20658
c/w No.22-20377

and ownership. There is no allegation that Rafoi was ever physically present in the United States during the scheme.[1] Murta, however, purportedly traveled to Miami, Florida, to meet with co-conspirators in furtherance of the scheme.

A grand jury returned a nineteen-count indictment charging Defendants and others with: (1) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); (2) conspiring to violate the Foreign Corrupt Practices Act (the "FCPA"), in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78dd-2(a), 78dd-3(a); and (3) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 2 (Rafoi) and 18 U.S.C. §§ 1956(a)(2)(A), 2 (Murta). Both Defendants moved to dismiss the indictment. In addition, Murta moved to suppress statements made during a March 2018 interview. The district court granted the three motions. This appeal followed.

## II. Subject-matter jurisdiction:

We begin by examining subject-matter jurisdiction. We review the district court's legal determination regarding subject matter jurisdiction *de novo*. *United States v. Kaluza*, 780 F.3d 647, 653 (5th Cir. 2015) (citing *United States v. Urrabazo*, 234 F.3d 904, 906 (5th Cir. 2000)). The district court concluded that the FCPA and money-laundering statute did not apply extraterritorially to Defendants, and thus the court did not have subject-matter jurisdiction. The court reasoned that "[j]urisdiction over [Defendants] under the FCPA rests in whether the government can establish that [he or she] was an 'officer, director, employee or agent' of a domestic

---

[1] The government concedes this point.

concern."[2]  Because there was no "direct or undisputed evidence" of an agency relationship in the United States, the court found that it lacked jurisdiction to adjudicate the case.  The money-laundering counts failed as well, said the court, because: (1) Rafoi did not commit some portion of the offenses "while in the United States"; and (2) there were no allegations that (a) Murta was in the United States "at the time the alleged transactions occurred, or that he initiated, or attempted to initiate them, from within the United States," or (b) "any of the communications or acts … occurred in the United States."  The court's dismissal on jurisdictional grounds was in error.

"In the criminal context, subject matter jurisdiction is straightforward."  *Id.* at 654 (citing *United States v. Scruggs*, 714 F.3d 258, 262 (5th Cir. 2013)).  Title 18 U.S.C. § 3231 provides that "[t]he district courts of the United States shall have original jurisdiction … of all offenses against the laws of the United States."  "To invoke that grant of subject matter jurisdiction, an indictment need only charge a defendant with an offense against the United States in language similar to that used by the relevant statute."  *Scruggs*, 714 F.3d at 262 (quoting *United States v. Scruggs*, 691 F.3d 660, 668 (5th Cir. 2012)) (internal quotation marks omitted).  "That is the extent of the jurisdictional analysis: 'a federal criminal case is within the subject matter jurisdiction of the district court if the indictment charges that the defendant committed a crime described in Title 18 or in one of the other statutes defining federal crimes.'"  *Id.* (quoting *United States v.*

---

[2] Relying on its decision in the *Rafoi* case, the court, in dismissing Murta's charges, reasoned that the indictment did "not establish that the defendant was an 'agent' to satisfy the jurisdictional requirements of the statute."

No. 21-20658
c/w No.22-20377

*Gonzalez*, 311 F.3d 440, 442 (1st Cir. 2002)) (alterations omitted). So, the district court had subject-matter jurisdiction under 18 U.S.C. § 3231.[3]

Moreover, whether a statute reaches extraterritorial acts is not a challenge to the district court's subject-matter jurisdiction. *United States v. Rojas*, 812 F.3d 382, 390 (5th Cir. 2016); *see also United States v. Vasquez*, 899 F.3d 363, 371 (5th Cir. 2018) ("An argument that a statute does not apply extraterritorially is not an argument that the court lacks jurisdiction."). Rather, "[e]xtraterritoriality 'is a question on the merits rather than a question of a tribunal's power to hear the case.'" *Vasquez*, 899 F.3d at 371 (quoting *Rojas*, 812 F.3d at 390); *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253-54 (2010) (concluding that the extraterritorial reach of a statute raises a "merits question," not a question of subject-matter jurisdiction). Therefore, because extraterritoriality concerns the merits of the case, not the court's power to hear it, the district court erred in concluding that it lacked subject-matter jurisdiction over these counts.

### III. The FCPA:

Next, we consider the court's dismissal of the FCPA-conspiracy charges on the grounds that the indictment did "not establish that the defendant was an 'agent' to satisfy the jurisdictional requirements of the statute." This Court reviews the sufficiency of an indictment *de novo*. *United States v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013). The government contends that the FCPA-conspiracy charges are valid under two theories. First, that Rafoi and Murta are directly liable as enumerated actors. And second, that Rafoi and Murta are secondarily liable as conspirators with enumerated actors. We address each in turn.

---

[3] Because this is an appeal by the United States, we have jurisdiction under 18 U.S.C. § 3731. *Kaluza*, 780 F.3d at 654.

No. 21-20658
c/w No.22-20377

### A. Liability as enumerated actors:

In pertinent part, enumerated actors under the FCPA are:

(1) any domestic concern, other than an issuer which is subject to section 78dd-1 of this title, or for any officer, director, employee, or **agent of such domestic concern** or any stockholder thereof acting on behalf of such domestic concern, 15 U.S.C. § 78dd-2(a) (emphasis added); or

(2) any person other than an issuer that is subject to section 78dd-1 of this title or a domestic concern (as defined in section 78dd-2 of this title), or for any officer, director, employee, or **agent of such person** or any stockholder thereof acting on behalf of such person, **while in the territory of the United States**, 15 U.S.C. § 78dd-3(a) (emphasis added).

The government contends that the indictment sufficiently alleges that Rafoi and Murta are agents of a domestic concern under § 78dd-2 and that Murta is liable as a person who acted while in the United States under § 78dd-3. We agree.

### i. Rafoi and Murta's potential liability under § 78dd-2:

We first address the indictment's allegations that Defendants are liable as agents of a domestic concern. "The validity of an indictment is governed by practical, not technical considerations, and the basic purpose behind an indictment is to inform a defendant of the charge against him." *United States v. Fairley*, 880 F.3d 198, 206 (5th Cir. 2018) (quoting *United States v. Cooper*, 714 F.3d 873, 877 (5th Cir. 2013)) (internal quotation marks and alterations omitted). "An indictment is legally sufficient if (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, and (3) the charge is specific enough to protect

6

the defendant against a subsequent prosecution for the same offense." *Id.* (quoting *Cooper*, 714 F.3d at 877) (internal quotation marks omitted).[4]

While Defendants argue that the factual allegations in the indictment do not support the government's conclusion that they are agents of a domestic concern, "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)). That is because "a defendant's constitutional *right* to know the offense with which he is charged must be distinguished from a defendant's *need* to know the evidentiary details establishing the facts of such offense, which can be provided through a motion for bill of particulars." *United States v. Gordon*, 780 F.2d 1165, 1172 (5th Cir. 1986) (citing *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980)) (emphasis in original). "To comply with Rule 7(c) [of the Federal Rules of Criminal Procedure], an indictment need not provide the evidentiary details of the government's case." *United States v. Ellender*, 947 F.2d 748, 755 (5th Cir. 1991) (citing *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986)). Thus, "[i]n determining whether an indictment is sufficient, [this Court] do[es] not ask whether the indictment could have been better drafted, but whether it conforms to minimal constitutional standards." *United States v. Dentler*, 492 F.3d 306, 309 (5th Cir. 2007).

---

[4] The Defendants are charged with two conspiracy charges and one substantive-offense charge. "It is well established that in 'an indictment for conspiring to commit an offense-in which the conspiracy is the gist of the crime – it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy.'" *Lawrence*, 727 F.3d at 397 (quoting *United States v. Graves*, 669 F.2d 964, 968 (5th Cir. 1982)).

No. 21-20658
c/w No.22-20377

Against this backdrop, Defendants' contention that the indictment does not sufficiently allege that they are agents of a domestic concern does not lend itself to the conclusion that the indictment is inherently insufficient. The indictment specifically alleges that both Rafoi and Murta acted as "agent[s] of a 'domestic concern' as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)." This paragraph is incorporated into every count with which Defendants are charged. Viewed practically, this express characterization of their agent-of-a-domestic-concern status is enough to be put on notice of the charge and agency theory asserted against them such that they may prepare a defense. Apart from meeting this minimum constitutional standard, the government need not describe all evidentiary details establishing the facts of the alleged agency relationship. *See Gordon*, 780 F.2d at 1172. Therefore, the district court's grant of Defendants' motions to dismiss was improper because the indictment adequately conforms to minimal constitutional standards.

### ii. Murta's potential liability under § 78dd-3:

Next, we address the indictment's allegations that Murta is liable as a person acting while in the United States under § 78dd-3 based on his meeting with co-conspirators in Miami, Florida. The indictment specifically alleges that Murta acted as "a 'person' as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1)." This paragraph is incorporated into every count with which Defendants are charged. Viewed practically, this express characterization of his status as a person acting while in the United States is enough to be put on notice of the charge asserted against him such that he may prepare a defense.

Murta counters that the charge, which relies on a sole visit to Miami, violates his due-process rights. "In the context of non-U.S. citizens," like Murta, "'due process requires the Government to demonstrate that there

8

exists "a sufficient nexus between the conduct condemned and the United States' such that application of the statute would not be arbitrary or fundamentally unfair to the defendant."'" *Lawrence*, 727 F.3d at 396 (quoting *United States v. Perlaza*, 439 F.3d 1149, 1160 (9th Cir. 2006)). To examine this nexus, we have looked to the aim of the charged activity and fair-warning principles. *Rojas*, 812 F.3d at 393.

First, "[a] jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Id.* (quoting *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011)). And here, this nexus is demonstrated because Murta was charged with the intent or knowledge that monies, which were the proceeds of specified unlawful activity, would be unlawfully transmitted from or through a place in the United States to a place outside the United States. This, at the very least, constitutes harm to United States' interests. *See id.*

Second, Murta had fair warning that his conduct could be criminally prosecuted. "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Id.* (quoting *Al Kassar*, 660 F.3d at 119) (emphasis in original). International-bribery schemes and money laundering are condemned universally by law-abiding nations. That international condemnation constitutes fair warning. *See Rojas*, 812 F.3d at 393 (concluding that no due-process violation existed where the crime was internationally condemned); *United States v. Suerte,* 291 F.3d 366, 371 (5th Cir. 2002) (same). In sum, the indictment does not violate Murta's due-process rights.

No. 21-20658
c/w No.22-20377

## B.  Liability as conspirators with enumerated actors:

In addition to potential liability as enumerated actors, the government contends that, "[u]nder well-established principles of secondary liability," Defendants may be liable for conspiracy even though they were incapable of committing the substantive offense.  So, says the government, Defendants may be charged as conspirators even if they are not the types of actors subject to principal liability under the FCPA.  The parties then ask this Court to rule on conspiracy-related issues that the district court did not consider,[5] including the application of the limited exception created by *Gebardi v. United States*, 287 U.S. 112 (1932), the implication of the FCPA's text, history, and purpose, and the presumption against extraterritoriality.

Since they were not ruled upon by the district court, this Court is not required to address these alternative arguments for or against dismissal. *Tercero v. Texas Southmost Coll. Dist.*, 989 F.3d 291, 298-99 (5th Cir. 2021). And we decline to rule on these arguments now.  *See, e.g.*, *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 411 (5th Cir. 2015) (remanding so district court could consider issues in first instance)); *Lone Star Nat. Bank, N.A. v. Heartland Payment Sys., Inc.*, 729 F.3d 421, 427 (5th Cir. 2013) ("[W]e decline to decide these complex issues as they are better addressed by the district court in the first instance."); *La. Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 749-50 (5th Cir. 2012) (concluding that the district court should determine in the first instance a complex question of law); *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 381 (5th Cir. 2009) ("The district court did not reach this ground.  Because the district court should have the opportunity to address the facts underpinning the claim of public disclosure and original source and make any

---

[5] These arguments were, however, presented to the district court.

10

No. 21-20658
c/w No.22-20377

necessary findings in the first instance, we do not reach this ground."); *Breaux v. Dilsaver*, 254 F.3d 533, 537-38 (5th Cir. 2001) (declining to consider issues not ruled upon by the district court). It is proper, then, for the district court to decide these conspiracy-related issues in the first instance.[6]

### C. Vagueness:

Next, we consider whether the term "agent" as used in the FCPA is unconstitutionally vague. A facial challenge to the constitutionality of a statute presents a pure question of law, which this Court reviews *de novo*. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009) (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006)). The district court determined that the term "agent" as used in the FCPA and the money-laundering statute[7] is unconstitutionally vague when used "as a jurisdictional basis to prosecute a foreign national." The government argues that the district court's analysis is incorrect. We agree.

"'The prohibition of vagueness in criminal statutes is an essential of Fifth Amendment due process.'" *United States v. Ross*, 948 F.3d 243, 246 (5th Cir. 2020) (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018)) (alterations omitted). "Along that line, the vagueness doctrine requires statutes 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 246-47

---

[6] To be clear, at this juncture, this Court neither accepts nor rejects the theory that an individual who falls outside of the actors enumerated in the FCPA can be held liable as a conspirator under a secondary-liability theory.

[7] Although the district court applied its vagueness analysis to both the FCPA and the money-laundering statute, the term "agent" does not appear in the money-laundering offenses charged against Defendants. *See* 18 U.S.C. §§ 1956(a)(1)(B)(i) (Rafoi) and 18 U.S.C. §§ 1956(a)(2)(A) (Murta).

11

(quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)) (alteration omitted). "[T]o be unconstitutionally vague, a statute must be impermissibly vague in all its applications, including its application to the party bringing the vagueness challenge." *Clark*, 582 F.3d at 612-13 (internal citation and quotation marks omitted). Further, a criminal statute is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997); *United States v. Kay*, 513 F.3d 432, 441 (5th Cir. 2007) (same). "Objections to vagueness under the Due Process Clause rest on the lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright,* 486 U.S. 356, 361 (1988).

The term "agent" is not vague. The district court's vagueness conclusion, which was rooted in the "novel application" of agency as a means to establish subject-matter jurisdiction, is inherently flawed. The court concluded that because "no court has interpreted the statute or rendered a judicial decision that fairly discloses the manner in which the term [agent] may be applied to establish jurisdiction," the term agent as "a basis for jurisdiction" is vague. But, considering that Defendants' statuses as agents implicate the merits of the case, not the court's subject-matter jurisdiction,[8] the court's conclusion that the term "agent" is unconstitutionally vague "when used as a basis for jurisdiction" is unsound.

Perhaps tellingly, Defendants do not defend the district court's vagueness analysis. Instead, the two argue that the term "agent" is vague on

---

[8] *See supra* Section II.

a lack-of-fair-warning theory.[9]    Rafoi argues that "agent" is unconstitutionally vague as applied to her because she "was not on notice that simply by acting as a service provider, money manager and by communicating about the alleged opening of Swiss bank accounts by a Swiss bank, she would be subject to criminal penalties in the United States." And so, says Rafoi, "a person of ordinary intelligence would not have understood Rafoi – a foreign national residing and working for a Swiss company in Switzerland performing standard wealth management services – to be an agent of a domestic concern and thus someone who would come within the scope of persons subject to the FCPA." Similarly, Murta conclusively contends that he did not have fair notice that his alleged conduct could subject him to U.S. prosecution under the FCPA as an "agent" of a domestic concern.

That the term "agent" in the context of the FCPA is not defined and, therefore, is governed by its common-law meaning,[10] "does not draw a line so vague that [Defendants] w[ere] not reasonably aware of [their] potential for engaging in illegal activity under the FCPA." *Kay*, 513 F.3d at 441. The indictment alleges that, among other things, Defendants, at the direction of their co-conspirators, set up "a complex web of bank accounts through which to conduct the financial transactions in connection with the scheme and conceal the nature and ownership of the proceeds." A person of common intelligence would have understood that Defendants, allegedly setting up

---

[9] Defendants argued this lack-of-fair-warning theory in their respective district-court briefings. The court, however, centered its analysis on jurisdictional grounds and did not address the lack-of-fair-warning theory.

[10] *Christiana Tr. v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018) ("To determine whether an agency relationship exists, the Supreme Court looks to the Restatement of Agency, which requires both the principal's control over the agent and both parties' consent to the agent's acting on the principal's behalf.").

accounts on behalf of others to obfuscate the source of monies knowingly derived from an illegal bribery scheme, "w[ere] treading close to a reasonably-defined line of illegality" under an agency theory of liability. *See Kay*, 513 F.3d at 442.[11]    Accordingly, the term "agent" is not unconstitutionally vague as applied to Defendants.

## IV. The money-laundering statute:

Next, we consider the money-laundering charges and whether they contemplate Defendants' conduct, which allegedly occurred "in part" in the United States in accordance with 18 U.S.C. § 1956(f).  This court reviews questions of statutory interpretation *de novo. Lawrence*, 727 F.3d at 391 (citing *Kay,* 359 F.3d at 742).  Section 1956(f) provides:

> There is extraterritorial jurisdiction over the conduct prohibited by this section if –
>
> (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and
>
> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

---

[11] In addition, Rafoi contends that "[i]f § 78dd-2(a) is not understood as subjecting to liability only those who act on behalf of a domestic concern, similar to an officer, director, or employee, in carrying out a substantive violation of the statute, then the term [agent] has no discernible meaning."[11]  She correctly observes that § 78dd-2(a) subjects those to liability when acting as an agent of a domestic concern.  And the indictment alleges exactly what Rafoi understands liability under § 78dd-2(a) to mean: that Rafoi carried out a substantive violation of the statute by acting on behalf of a domestic concern.  Because the term "agent" is not unconstitutionally vague as applied to Rafoi, her argument fails.

No. 21-20658
c/w No.22-20377

The government argues that the district court was wrong to conclude that conduct can only occur "in part" in the United States if the actor "commit[s] some portion of the offense *while in the United States*." We agree.

The text of 18 U.S.C. § 1956 demonstrates Congress's clear and specific intent for the statute to apply extraterritorially in a case like this, where a foreign citizen engages in money-laundering activity in part in the United States. There is no physical-presence requirement. *See*, *e.g.*, *United States v. Ojedokun,* 16 F.4th 1091, 1106 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2780 (2022) (finding unpersuasive the argument that § 1956(f) did not apply to a defendant who was not a U.S. citizen, whose actions occurred entirely overseas, and who did not enter the U.S. during the conspiracy); *see also United States v. Stein*, 1994 WL 285020, at *4 (E.D. La. June 23, 1994) (unpublished) (Clement, J.) ("It is plain from both the purpose of section 1956 [18 U.S.C. § 1956(f)] and its legislative history that Congress did not intend to limit section 1956 so that it would only apply to defendants who are actually present in the United States."). In fact, in *United States v. Iossifov*, the Sixth Circuit recently endorsed the principle that a defendant need not be physically present in the United States to fall within the reach of § 1956(f). 45 F.4th 899, 912-14 (6th Cir. 2022). There, the court observed that § 1956(f) "explicitly states that it applies to foreign citizens where the conduct in question occurs, at least 'in part,' in the United States." *Id.* at 912. It concluded that the statute's reach encompassed the foreign defendant because his conspiratorial conduct – which included communicating with persons located in the United States and creating false identifications to facilitate transactions within the United States – occurred "in part" in the United States. *Id.* at 912-14. The Sixth Circuit did not require that the defendant be physically present in the United States. *Id.* at 913 ("[A]s long as … conspiratorial conduct occurred in the United States, jurisdiction was

15

proper here."). Likewise, Rafoi's conduct need not have occurred while she was physically present in the United States.

The indictment alleges that "in the Southern District of Texas and elsewhere," Rafoi "did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct" the Rincon-Company-2 wire, a financial transaction. The indictment, then, expressly alleges that the transaction and Rafoi's activity took place, at least in part, in the United States in accordance with § 1956(f).[12]  Similarly, the indictment alleges that "in the Southern District of Texas and elsewhere," Murta "did knowingly set up the structures and accounts used in the money laundering scheme."  The indictment, then, expressly alleges that the transaction and Murta's activity took place, at least in part, in the United States in accordance with § 1956(f). Whether there is proof that Defendants did, in fact, engage in conduct that took place in part in the United States is surely a fair subject for a trial defense.  But for now, the allegations that Defendants engaged in conduct that occurred in part in the Southern District of Texas satisfy the money-laundering statute's extraterritorial provision.  The district court erred in concluding otherwise.

## V.  Tolling the statute of limitations:

Next, we consider the government's challenge to the district court's dismissal of Murta's indictment on statute-of-limitations grounds.  "The district court's ultimate decision that the statute of limitations was properly tolled is a legal conclusion reviewed *de novo.*"  *United States v. Wilson*, 322 F.3d 353, 359 (5th Cir. 2003).  Factual findings underpinning that ultimate

---

[12] Moreover, Rafoi's argument that Rincon Company 2's action could have originated outside of the U.S. via its Venezuelan affiliate, as opposed to in the U.S., is of no import.  It matters not where the transaction originated, but that the defendant's conduct occurred in part in the United States.  *See* § 1956(f).

finding, however, are reviewed for clear error. *United States v. Pursley*, 22 F.4th 586, 589 (5th Cir. 2022).

The statute of limitations for Murta's alleged offenses is five years, *see* 18 U.S.C. § 3282, and is subject to suspension. The length of the suspension of the statute of limitations is determined by 18 U.S.C. § 3292. *United States v. Pursley*, 22 F.4th 586, 589 (5th Cir. 2022). Section 3292 provides:

> **(a)(1)** Upon application of the United States, filed **before return of an indictment**, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

> **(b)** Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

> **(c)** The total of all periods of suspension under this section with respect to an offense--

>> **(1)** shall not exceed three years; and

>> **(2)** shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section. ....

17

No. 21-20658
c/w No.22-20377

18 U.S.C. § 3292 (emphasis added).

The district court found that the 2019 indictment - the first of the indictments to charge Murta – was untimely because the mutual legal assistance treaty ("MLAT")[13] requests and related tolling orders failed to toll the statutes. The government contends that under § 3292, the second MLAT request and related tolling order suspended the five-year statute of limitations of the offenses charged. We agree.

### i. Pertinent facts:

Over the course of its five-year investigation, the government submitted multiple MLAT requests to other countries. It filed related applications to toll the statute of limitations in the district court. And the grand jury returned multiple indictments.

In 2014, the government submitted its first MLAT request to Switzerland and filed a related application to toll the statute of limitations in the district court. Neither the MLAT request nor the tolling application identified Murta. A district judge granted the government's application on September 21, 2015. Approximately two months later, a grand jury returned its first indictment. Murta was not charged.[14]

The government submitted its second MLAT request to Switzerland on November 7, 2016, and filed a related application to toll the statute of limitations in the district court. A district judge granted the government's

---

[13] The district court noted that "the government may move to suspend the tolling of the statute of limitations during a request of foreign authorities for documents or records that might aid a grand jury in its determination whether there is evidence to indict a person." One such request is an MLAT.

[14] On June 8, 2016, Swiss authorities provided documents in response to the December 2014 MLAT request. The government, however, purportedly never received a formal letter of final execution regarding this MLAT request.

application on January 12, 2017.[15]  Neither the MLAT request nor the tolling order identified Murta.  Months later, on August 23, 2017, a grand jury returned a superseding indictment.  Murta was not charged.

The government submitted its third MLAT request on March 5, 2018, this time to Portugal, requesting that Portuguese authorities interview Murta and others as witnesses.  Fifteen days later, two U.S. agents interviewed Murta for multiple hours at a local criminal investigation office in Portugal.  In 2019, a grand jury returned an indictment charging Murta for offenses allegedly committed between 2011 and 2013.

### ii.  Analysis:

Section 3292 has four prerequisites that, if present, mandate[16] a court order of tolling: (1) the United States must apply for tolling, (2) the application must be "filed before return of an indictment," and the court must find by a preponderance of the evidence both that (3) "an official request has been made" for foreign evidence and (4) "it reasonably appears" that such evidence is or was in that foreign nation.  18 U.S.C. § 3292.  There is no dispute that, upon (1) an application of the United States, a court found that (3) an official request was made and that (4) it reasonably appeared that evidence was in that foreign nation.  Nor is there any dispute that, if the second MLAT's 2017 Tolling Order was not improvidently granted and did, in fact, apply to Murta, the statute of limitations was tolled sufficiently such

---

[15] It was not until August 15, 2018, that Swiss authorities provided documents in response to the November 2016 MLAT request.  The accompanying transmittal letter stated that the enclosed documents resulted from the "*partial* execution" of the 2016 MLAT request.  On October 4, 2018, the Swiss government provided additional evidence and a transmittal letter stating that it had fully executed the November 2016 MLAT.

[16] *See Sierra Club v. Train*, 557 F.2d 485, 489 (5th Cir. 1977) ("Use of the word 'shall' generally indicates a mandatory intent unless a convincing argument to the contrary is made").

that Murta was properly and timely indicted as to these alleged crimes. Thus, the suspension was both warranted and effective unless the application was not (2) "filed before return of an indictment."

The parties disagree as to whether this statute gives the government only one shot to get it right – that is, whether for any one course of illegal activity, the government may use § 3292 to toll the statute of limitations only once and for all possible participants. This particular dispute is a matter of first impression for any federal court. In order to interpret the statute, it makes sense to consider it in the context of a criminal investigation. As an ordinary matter of course, investigation of an offense is always likely to reveal its participants, perhaps multiple, and the indictment of one participant does not prohibit the subsequent indictment of another – this much is above dispute. It is unclear whether the language of this statute changes the nature of this ordinary course.

In the federal criminal system, tolling of the statute of limitations must be established "by law;" there are no common-law or equitable-tolling provisions for the filing of an indictment. *See* 18 U.S.C. § 3282(a). Moreover, "criminal limitations statutes are to be liberally interpreted in favor of repose." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (cleaned up). "The purpose of a statute of limitations is to … protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Id.* at 114-15. "Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Id.* at 115.

In the case of investigations involving foreign evidence, though, Congress determined that investigators ought to have the opportunity to toll the statute of limitations in certain circumstances "to compensate for 'delays

attendant in obtaining records from other countries.'" *United States v. Meador*, 138 F.3d 986, 994 (5th Cir. 1998) (quoting H.R. Rep. No. 98-907, at 2-3 (1984)). This accords naturally with the "salutary effect" of a statute of limitations – while domestic investigators faced with a statute of limitations are encouraged to investigate promptly, officials in other nations have no such interest in crimes being investigated and prosecuted by other nations. Congress determined that this fact of life ought not to deter or hinder criminal investigations.

And as the case law indicates, statutes of limitations are designed to "protect individuals," *Toussie*, 397 U.S. at 114, and rightly so, for it is individuals who face the consequences of actions – not offenses. This simple fact also illustrates why the language of "an indictment" in the statute most neatly corresponds to the government's view of the case here. As the government points out, had Congress intended the statute to refer to "any" indictment relating to the offense in question, it could have done so by use of "any," "initial," "first," or another such word, and Congress has done so in other statutes, *see* 18 U.S.C. § 3282(b) ("In any indictment for an offense under chapter 109A for which the identity of the accused is unknown…"). Instead, "before return of an indictment" is more naturally read to refer to the indictment charging the specific defendant in question with the offense(s) under investigation by the grand jury and for which foreign evidence has been officially requested. Thus, it operates as a limitation on the government's ability to seek additional tolling even after it has received the records from foreign countries and sought an indictment against that particular defendant. In keeping with the general purpose of statutes of limitations, § 3292 is designed to ensure prompt and diligent pre-indictment investigation.

So, the language of the statute lends itself to the government's interpretation, especially in light of the manner in which investigations typically proceed. The government is correct that "[p]recluding [it] from

tolling the statute of limitations as to newly implicated defendants … even though the process of requesting and receiving evidence from a foreign government often takes substantial time (and longer than the use of subpoenas for U.S.-based evidence), would be inconsistent with the purpose of § 3292." The district court's conclusion that § 3292 failed to toll the statute of limitations is erroneous.

## VI. Motion to suppress:

Next, we examine the district court's grant of Murta's motion to suppress. In March of 2015, Portuguese authorities, at the request of the U.S. government, interviewed Murta as a witness. The interview lasted multiple hours and was conducted at a local criminal investigation office in Portugal. Murta was accompanied by his lawyer.[17] Two translators and a Portuguese judicial police inspector were also present during the interview. Murta was never read his *Miranda* rights and, accordingly, later moved to suppress the statements made. The district court granted the motion after concluding that Murta was questioned while in a custodial environment. The government argues that Murta was not "in custody" under *Miranda* during the interview. We agree.

"Custody determinations under *Miranda* present a mixed question of law and fact." *United States v. Coulter*, 41 F.4th 451, 456 (5th Cir. 2022) (quoting *United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019)) (internal quotation marks omitted). "When considering the denial of a motion to suppress, this Court reviews factual findings for clear error and legal conclusions, including whether *Miranda*'s guarantees have been impermissibly denied, de novo." *Id.* (quoting *United States v. Nelson*, 990

---

[17] There is no argument made, nor any record evidence suggesting, that this attorney was incompetent or inadequate in any way.

F.3d 947, 952 (5th Cir. 2021)) (internal quotation marks and alteration omitted).  "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. Jacquinot,* 258 F.3d 423, 427 (5th Cir. 2001).  "[T]his court evaluates evidence in the light most favorable to the party that prevailed in the district court, and it will uphold the district court's ruling on the motion if there is any reasonable view of the evidence to support it." *Coulter*, 41 F.4th at 456 (quoting *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021)) (internal quotation marks and alteration omitted).

"Custodial interrogations that necessitate *Miranda* warnings consist of 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Coulter*, 41 F.4th at 457 (quoting *Miranda*, 384 U.S. at 444).  "Custody for purposes of *Miranda* 'is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.'" *Arellano-Banuelos*, 927 F.3d at 359 (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)).

This Court employs a two-step inquiry to determine whether a custodial interrogation occurred.  First, looking at the totality of the circumstances, the Court analyzes the defendant's freedom of movement.  Next, it analyzes whether the questioning took place in an environment resembling the stationhouse questioning at issue in *Miranda*.  *Coulter*, 41 F.4th at 457-58.

### i. The freedom-of-movement test:

To the first step.  "A suspect is … 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal

23

arrest." *Coulter*, 41 F.4th at 457 (quoting *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015)) (alteration in original). "The reasonable person through whom [this Court] view[s] the situation must be neutral to the environment and to the purposes of the investigation – that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). "Neither the officer's nor the suspect's subjective intent 'is relevant to the custody determination.'" *Coulter*, 41 F.4th at 458 (quoting *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010)).

"A custodial determination in the *Miranda* context involves 'an objective determination, depending on the totality of the circumstances, that looks to the circumstances surrounding the interrogation and whether, given the circumstances, a reasonable person would have felt he was at liberty to terminate the interrogation and leave.'" *Id.* (quoting *Nelson*, 990 F.3d at 955). "[T]o determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation,'" *Howes*, 565 U.S. at 509 (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994), including:

- The length of the questioning;

- The location of the questioning;

- The accusatory, or non-accusatory, nature of the questioning;

- The amount of restraint on the individual's physical movement; and

- The statements made by officers regarding the individual's freedom to move or leave.

*Coulter*, 41 F.4th at 458 (citing *Wright*, 777 F.3d at 775). "No one fact is determinative." *Wright*, 777 F.3d at 775.

No. 21-20658
c/w No.22-20377

Notwithstanding the want of record evidence, the district court presumably found the third and fourth factors decisive as those were the only two factors considered in its analysis section. For example, it concluded that: (1) the agent's questions were "asked in an intimidating manner and were designed to elicit incriminating responses"; and (2) Murta was restrained and not free to leave where Portuguese law allegedly "required the defendant's attendance, even as a 'witness', to appear and remain in the interview until the questioning was concluded." But because the freedom-of-movement test is based on the totality of the circumstances, we consider each of the five factors in turn.

First, the length of the questioning. The district court observed that "[t]he interview started at 10:00 a.m. and continued until 6:50 p.m." and "[b]etween those hours, the defendant took a lunch break and two fifteen-minute breaks." At 4:50 p.m., Murta began reviewing and revising a typed transcription of the agents' interview notes. The length of the detention certainly raises considerable suspicion. *See United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990) (observing that a detention of approximately an hour raises considerable suspicion). This Court, however, "has warned against 'overreliance upon the length of questioning' because doing so 'injects a measure of hindsight into the analysis which it wishes to avoid.'" *Coulter*, 41 F.4th at 458-59 (quoting *Harrell*, 894 F.2d at 124 n.1).

Second, the location of the questioning. The district court stated that Murta, accompanied by his attorney, was interviewed in a conference room at a local criminal investigation office. When a defendant is "interviewed in a well-lit, averaged-sized conference room, where he was 'not uncomfortable,'" the environment negates a finding that the defendant is in custody. *Howes*, 565 U.S. at 515. There is no description of the conference room set forth in the record on appeal. In addition to Murta and his attorney, there were two U.S.-government agents, one Portuguese judicial police

25

inspector, and two translators in the room.  To be sure, the presence of multiple agents may indicate that an individual is in custody.  That Murta's attorney was present, however, is key.  *See Chavira*, 614 F.3d at 135 (observing that the presence of only government agents weighs in favor of finding that defendant was "in custody").  Likely, the "criminal investigations office" is not the isolated police-station setting that brings with it the compulsion to speak where Murta was accompanied by his attorney to guard him against intimidation, coercion, or trickery.  *See United States v. Mandujano*, 425 U.S. 564, 579 (1976); *Howes*, 565 U.S. at 512 (observing that isolation may contribute to a coercive atmosphere by preventing individuals who serve as safeguards from attending the meeting).  Indeed, the presence of counsel is an adequate protective device employed to dispel the compulsion inherent in custodial surroundings.  *Miranda*, 384 U.S. at 458, 466.

Third, the accusatory or non-accusatory nature of the questioning.  Without citation to the record, the district court stated that "[t]he DHS agents conducted the entire interview, asking all the questions" and "[a]ccording to the defendant, in instances where his answers appeared to [the agents] to be untruthful or inaccurate, the agents became argumentative, attempting to persuade him to change his statement(s)."  Moreover, without explanation, the court concluded that the questions were asked "in an intimidating manner and were designed to elicit incriminating responses."  The only two sources of record evidence describing the interview, the Record of Examination and Murta's attorney's affidavit, contradict such conclusions.

The Record of Examination presents a 16-page summary of the interview, which Murta and his attorney had the liberty to review and revise for two hours following the close of questioning.  This summary highlights the bland, non-accusatory and cooperative tone throughout.  For example,

No. 21-20658
c/w No.22-20377

the summary notes:

- "He was asked what was his connection with the Espirito Santo Group?"

- "When asked who ordered those payments to be made, he stated that it is in the newspapers, as far as he knows, it was a decision from the BES board of directors."

- "When asked if he knew Roberto Rincon, he answered that he does not remember."

- "When asked to comment on the fact that Abraham Shiera claimed that the respondent herein knew who the 'friends' were, he stated that if he said that, it is probably true, but that he does not recall who they are."

- "He was asked who recommended César?  He did not have the slightest recollection, if he opened Labarca's account, he certainly knew him, but he surely did not know César."

This representative sample of non-accusatory and non-threatening questions does not support the district court's conclusion. *See Coulter*, 41 F.4th at 460 (observing that non-accusatory and non-threatening inquiries negated the fact that defendant was in custody); *Wright*, 777 F.3d at 777 (observing that cooperative tone throughout interview transcript negated proposition that defendant was in custody).

Moreover, absent from the one short paragraph in Murta's attorney's affidavit describing the interview is any indication of its tone.  Murta's attorney's observation that "[s]everal times throughout the meeting, the American agents said that they wanted Mr. Murta's help" weighs against a finding that the interview was accusatory or threatening.  *See Coulter*, 41

F.4th at 460 (observing that a police officer's statements that he wanted the defendant to "be honest" and "real upfront with him" evidenced non-accusatory and non-threatening interview) (alterations omitted).  Further, Murta's attorney's observation that the agents repeatedly informed Murta that he was only a witness, not a subject or target, evidences the non-accusatory nature of the questioning.  At no point was he accused of any crime so as to heighten apprehension. *See Chavira*, 614 F.3d at 135.  So, when identified as a mere witness tapped to help the government, it cannot be said that Murta had some sort of "*awareness* … that he ha[d] become the 'focal point' of the investigation, or that the police already ha[d] ample cause to arrest him, [which] may well [have] [led] him *to conclude, as a reasonable person,* that he [wa]s not free to leave, [and] that *he ha[d]* been significantly deprived of his freedom." *See Bengivenga*, 845 F.2d at 597 n.16.  While "the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained," *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984), a reasonable person reminded that he is a witness and there to help the government would not have the impression that the interview would continue until a confession was given.

Fourth, the amount of restraint on the individual's physical movement.  "Not all restraints on freedom of movement amount to custody for purposes of Miranda." *Howes*, 565 U.S. at 509.  "Indeed, 'some *significant* restraint of freedom of movement must have occurred,'" *Coulter*, 41 F.4th at 460 (quoting *United States v. Howard*, 991 F.2d 195, 200 (5th Cir. 1993)) (emphasis in original and alteration omitted), such that a reasonable person in Murta's position would have equated the restraint on his movement with formal arrest. *Id.*  There is no evidence that Murta was physically restrained.  Nor is there evidence that he was "followed and monitored," which would indicate restraint, during the multiple breaks

permitted over the course of the interview. *See United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (observing that the following and monitoring of defendant on breaks weighed in favor of a finding that defendant was in custody).

The district court concluded that Murta was restrained because Portuguese law required him to appear and remain in the interview until the questioning concluded. It sourced this conclusion from Murta's attorney's affidavit, which explains that a witness is required to attend the noticed interview and can be arrested for non-appearance. Even assuming that the requirement to attend the meeting is a requirement to be present for its entire duration, "the general obligation to appear and answer questions truthfully d[oes] not in itself convert [a defendant's] otherwise voluntary statements into compelled ones." *Murphy*, 465 U.S. at 427. And no such conversion took place. The record does not support that any compulsion Murta might have felt as a result of Portuguese law was "comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Id.* at 433. Therefore, it does not stand to reason that Murta, who was legally required to appear and did so, was necessarily placed "in custody" under *Miranda*.

Lastly, the statements made by officers regarding Murta's freedom to move or leave. Without record support, the district court stated that "[a]t no time did the DHS agents inform the defendant that [Murta] had the protection of the federal Constitution and could refuse or stop the questioning or not … sign a statement." To be sure, there is no evidence that the agents advised Murta that he was free to move or leave or that Murta asked or attempted to end the interview and was denied. Instead, the agents said "multiple times" that Murta was only a witness, not a suspect or target, which would suggest to a reasonable person that he had the freedom to move or leave and that he was not under arrest. *Cf. Coulter*, 41 F.4th at 461.

29

"Informing a suspect he is 'not under arrest, even without explicitly telling him he is free to leave, .... would also suggest to a reasonable person that he is free to leave.'" *Coulter*, 41 F.4th at 461 (quoting *United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015)) (alterations omitted).  Against this backdrop, a reasonable person, summoned to an interview with his attorney present and having been repeatedly reminded that he was merely a witness, would not have equated his interview with formal arrest.

The totality of the circumstances indicates that a reasonable person in Murta's position would not have equated the restraint on his freedom of movement with formal arrest.[18]  But in the unlikely event that a reasonable person in Murta's situation thought he was "in custody," no evidence suggests that the environment in which Murta was interviewed was tantamount to a station-house interrogation as contemplated by *Miranda*, which is the second step of the inquiry.

### ii.  Station-house environment

To the second step.  This Court must determine "whether the relevant environment [in which Murta was questioned] presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes*, 565 U.S. at 509.  The station-house-environment concerns at issue in *Miranda* are not implicated here.

In *Miranda*, the Supreme Court observed that the "practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles – that the individual may not be compelled to

---

[18] Murta urges this Court to affirm the district court's suppression order on the grounds that his statements were involuntary and therefore inadmissible.  Murta did not raise his voluntariness argument in his original motion to suppress, and the district court did not rule on it.  Accordingly, we decline to reach this argument since it is better addressed by the district court in the first instance.

incriminate himself.  Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Miranda*, 384 U.S. at 457-58.  One such "adequate protective device" is "[t]he presence of counsel," as he or she "would insure that statements made in the government-established atmosphere are not the product of compulsion." *Id.* at 466.  Why, then, would Murta's interview present the same inherently coercive pressures as the type of station-house questioning at issue in *Miranda* when the Court acknowledged that such pressures are mooted by the presence of his attorney?  It does not.

First, in the presence of Murta's attorney, it is unlikely that the interrogators would abuse their powers or that Murta would submit to the U.S. agents' will and confess.  Thus, the Supreme Court's concern that incommunicado interrogation in a police-dominated atmosphere would result in self-incriminating statements without full warnings of constitutional rights, *Miranda*, 384 U.S. at 445, is not implicated while Murta's attorney is present.  In other words, Murta's attorney's presence and involvement for the entirety of the interview, including the fact that he reviewed and signed off on the interview notes, dispels the compulsion inherent in custodial surroundings.

Second, the Supreme Court has "recognized that many official investigations … take place in a setting wholly different from custodial police interrogation." *Mandujano*, 425 U.S. at 579-80.  Here, the purpose of Murta's interview was to gather information from a witness about individuals related to a bribery and money-laundering scheme.  Murta, a witness who had been repeatedly told that he was not a target or suspect and not accused of any crime, was therefore "unlikely to be lured into speaking by a longing for prompt release" or to be "pressured to speak by the hope that, after doing so, he will be allowed to leave and go home." *Howes*, 565 at 511.  So, the

environment in which the agents questioned Murta, wherein his attorney could safeguard against police coercion, does not present the same inherently coercive pressures as the station-house questioning at issue in *Miranda*. The district court's order suppressing the statements, then, was erroneous.

## VII. Conclusion:

The district court's grant of Rafoi and Murta's motions to dismiss and Murta's motion to suppress was error. Accordingly, we REVERSE and REMAND.